Morning, Your Honors. Jim Ball, representing Mr. Kilby. Your Honors, in this case, the issue, as I believe, is whether the district court erred in calculating Mr. Kilby's sentencing guidelines. As laid out in the brief in the trial transcript, essentially, the jury found, beyond a reasonable doubt, that there were about 7,000 pills of FOXI involved in the case. The only thing that was unfortunate about the case is that when the jury determined how many pills, they didn't determine how much weight the FOXI was. Therein lies the issue in regards to the district court. Essentially, what happened at district court level is that the district court looked at the application notes that came from the pre-sentence investigator, essentially application note 11, and determined that since there wasn't the weight of the drug, that they used case-specific information to determine what the weight of the drug is, and what the district court essentially did was look at other cases, two other cases around the union, and see exactly what the milligram per dosage was on the drugs, and came to what I mentioned in the brief was, I believe, merely a guess. They came down to 100 milligrams per dosage, which wasn't really fact-specific to any specific case or anything of that nature. That's correct. Essentially, what you had in the trial testimony was just testimony on how many ounces, and testimony of how many pills per ounce, and so no drugs were ever recovered. I'm sorry, Judge, I couldn't hear you. There was in Mr. Luker's testimony. Essentially, he said that at one point, he delivered 1,300 pills to Mr. Kilby. I'm sorry, FOXI. That's correct, Judge. I'm essentially right on the FOXI argument. That is correct. Well, it looks like there might be two different ways. It all comes from Luker's testimony, since there was no FOXI that was recovered. He says at one time that he delivered, at one point, 1,300 pills, and then he says, well, later I delivered two ounces to Mr. Kilby, and then in cross-examination, they go, well, how many pills per ounce, and he says about 2,800. Then he says again, well, the first transaction was an ounce, but it was only 1,300 pills, and so it's a little ambiguous exactly how many pills. There's a way you can calculate that. Essentially, what I tried to do with my brief was to calculate. I essentially took three ounces. I took his testimony and said, okay, well, he says three ounces. Give him the benefit of the doubt, and so I multiplied that, and I came to, and you can do the conversions the way the pre-sentence investigator did. I came out to seven kilograms of marijuana, and the pre-sentence investigator came out with 35 kilograms of marijuana. I'm imagining that it could be because I don't think the record is really all that clear if you want to use the case-specific information, that part of the note. I mean, if you remand the case and go, judge, we want case-specific information, I think there's enough in the record to come to a determination, but if it's not reliable, if the court doesn't think it's reliable, I think what the application note essentially says, well, if you can't find case-specific information on this case, not other cases, you have to look at the drug equivalency table from the DEA, and since FOXIE's not on that table, oh, I'm sorry. FOXIE's not on the table, judge. That's exactly right, and so in the PSR, essentially, the pre-sentence investigator went to the DEA and essentially says, okay, FOXIE's not on the table. What's the analog drug, which application note 5 says you need to do, and the analog drug essentially is DMT, and so if they do the conversion, it comes down to 10 milligrams per tablet, and so the way I figured it, even if I use the case-specific information of 3 ounces if you do the conversion or if you use the table, which is 10 milligrams, it's still the same. You're still going to be in the same base offense level, so I don't know if it makes a whole lot of sense to do it rather than if you look at trial transcripts and say, well, I don't think it's all that reliable, so you go straight to the table, it still is going to be the same. That's correct, and essentially, correct. I can imagine they could put in that information if it was remanded for sentencing. However, I think the application note makes it very clear by giving the defendant the benefit of the doubt on any drug when the weight is not determined. It seems like it kind of falls with the Ninth Circuit's decision in Shan, but the application note and application note 11 talked about that if there's no drug quantity, it's going to be a conservative estimate, and I think rather than getting into that whole mess to figure out exactly how much filler was in each and every pill, I think the sentencing commission essentially said, in this type of situation, it's going to be this, this, and this, rather than get into a whole big issue of figuring how much dosage per pill. I think the reason for that is that these are such designer drugs that every person has their own pill press, and as you can see in those cases that the district court looked at, those pills range from 235 milligrams down to, I think, 135, 155 milligrams, and so there's a huge discrepancy on who's ever making these pills and how much FOXA they put in the pills and how much filler they put in the pills and how much, you know, when it digests in your system, all that type of stuff. So it looks like the sentencing commission, if you follow those application notes, essentially says, in this type of instance, we're just going to say, use the drug equivalency table if it's not inside, if there's no case-specific information in regards to the amount of the drug. Okay, unless you guys have any more questions. That's the issue in the case, I believe, and I'd be happy to reserve parts if you want. Thank you. May it please the courts. I'm Alan Burrow, assistant U.S. attorney from Boise, Idaho. I'd point out to the court that the issue that was presented to the district court regarding the FOXA calculation was really just a poker issue. That was the argument actually made before the district court, was that the methodology or the weight of the pills had to be proven beyond a reasonable doubt. And then in the opening brief, Mr. Kilby argued that even if it doesn't have to be proven beyond reasonable doubt in the wake of poker, the methodology still has to be reasonable. And the problem with using the testimony of Mr. Lucker in this case is exactly what counsel stated to the court a few minutes earlier. It was very ambiguous because this testimony came out in bits and pieces through cross-examination and that kind of thing. If you take exactly what Mr. Lucker said and you multiply it out, three ounces of FOXA in 2,800 pills each, you end up with 8,400 FOXA pills. Well, the jury found that there were 7,000 FOXA pills in the case, and that's the problem. The testimony came out in bits and pieces, and it's very ambiguous. As the pre-sentence investigator found in this case, in paragraph 56 of the PSR, there was one particular case, only one, in the District of Idaho. By the time the amended PSR came out, one FOXA case. But in that case, the dosage weight was determined to be 3.2 grams per pill, which was just astronomical. There were only two other cases in which the DEA labs across the country had analyzed FOXA pills. One from the East Coast, the other one from San Francisco. One had over 200 milligrams of FOXA per pill. The other one had about 135, I believe it was. Yes, Your Honor. Well, what the thing is, is the direction that is given to the district court in this kind of a case is it has to approximate the amount of the drugs and approximate the weight. And the law of this court, in sentencing guidelines, the fact that the law of the Supreme Court is, is that when it's a mixture that you're dealing with that's charged under 841, you have to go with the total weight of the pill, including whatever the cutters' agents are. Here, what the probation officer did and the district court adopted, I think, was eminently reasonable and conservative and beneficial, resolving all doubts in favor of Mr. Kilby here. The two cases, you had 3.2 grams per pill in the District of Idaho. That's a huge amount. You have 200 and something on the East Coast, milligrams per pill. You've got 135 milligrams per pill in San Francisco. The probation officer took 40% less than the least amount that had ever been found in a case and went down to 100 milligrams per pill. We're dealing with there, that would be both Foxy and the cutting agents. You're talking about less than the size of a half of a baby aspirin. And so that was a very conservative approach. The district court took that and then said, I'm going to knock another two levels off the guideline level here just for good measure, just to be very conservative and so forth. And it just seems to me that the court was very reasonable, very conservative, given what it had to deal with under the circumstances. Well, given what it had to deal with, why didn't it take the amount of Foxy that was known and use that as opposed to adding in fillers that had no proof? Well, because, Your Honor, the amount of Foxy was not known. As counsel pointed out and as I reiterated, the testimony, the little bit of testimony that was given in this case was very, it came out in bits and pieces, it was very ambiguous. If you extrapolate it out, you end up with way more Foxy than what the jury found. And the result that Mr. Kilby also... Way more Foxy or way more pills? I'm sorry? Way more Foxy or way more pills? Way more pills. Right, but not way more Foxy. We know that you've got a relatively good fix on how much Foxy has evolved, right?  That's the problem. And the guidelines and this court and the Supreme Court say you're not just concerned here with the amount of Foxy. You're concerned here with the weight of the total pill. I know that, but it has to be based on some reliable evidence. And the evidence in this case, it's hard to say it's reliable in the sense that it has no relationship to the facts of this case. Let me ask you the same question I asked Mr. Ball. If we were to agree with the appellant's position that this is not a correct determination of the amount and send it back, is there any other evidence that could be adduced to get a better, more accurate figure? Your Honor, I do not specifically know. I do not know if we've had any other Foxy cases since this time in the District of Idaho. I do not know if the DEA labs have looked at any more cases. And I don't know if we called Mr. Lucker to the stand at the sentencing hearing and really tried to pinpoint this issue, whether he could provide more specific testimony about what they actually did in this case. That would be possible. That really wasn't that much of a focus at the jury trial, and that's why the testimony kind of came out in bits and pieces and is very ambiguous. Those would be the only three sources of information that I can think of. Unless the Court has any further questions.  Thank you. Thank you, Your Honor. I think when counsel is talking about it, it really comes down to what is this term, case-specific information? What I've been arguing is I think it's case-specific to this case rather than other cases. And counsel also makes the argument that the Court needs to essentially approximate. Now, when he uses that, he's essentially talking about Application Note 12. Okay? And so there's a big difference there. And so I want to make the Court very aware that in this case, the Court has to use Application Note 11 as far as I'm concerned, because that's the one that essentially lays out the standard when you know the quantity of the pills. And Application Note 12 essentially says, where there is no drug seizure, which I guess is the case here, the Court shall approximate the quantity of the controlled substance. But in this case, the jury found out beyond a reasonable doubt that the quantity was 7,000 pills. And so in that regard, Application Note 11 essentially controls. And when Application Note 11 controls, you use case-specific information. If it's not in there, you have to go to the drug equivalency table. And that would essentially lead you to 10 milligrams. And so when we ask the question, can we send this back and have the Court redo all this, I don't know if that's what Application Note 11 essentially says. It essentially says if it's in there, it's in there. And if it's not, you go to the table. That simple. And in regards to the reasonableness, I think the latest Ninth Circuit case at Cantrell essentially says that the Court has to find out. You don't even get to the reasonableness argument until you actually find out if the guidelines are actually done correctly. Are you saying that Application Notes 11 and 12 are exclusive of each other? I think so. Yeah. It looks like to me that Application Note 11 controls when you have a quantity, but not the weight. And Application Note 12 essentially controls when you don't know the quantity. Especially in Application Note 11, if you look at it, it essentially talks about pills. If you know the quantity of the pills, but not the weight. Well, 12 says where there is no drug seizure. Isn't that this case? Well, yeah, I can see the argument being made there, but I'm looking down a little bit lower. It says where there's no drug seizure. It goes on to the Court shall approximate the quantity of the controlled substance. And so if you read those together, I guess it really doesn't make a lot of sense. But in this case, actually, we know the quantity. So I don't see why the Court would have to talk. Well, there's testimony of the quantity, right? Right. And so that's essentially what I looked at in that case. All right. Thank you very much. Thank you. Thank you.
judges: Fernandez, Tashima, Paez